## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) M. LEE ARNOLD, Derivatively on Behalf of, CHESAPEAKE ENERGY CORPORATION, | ) ) ) ) |
| | ) Case No. CIV-11-986-M |
| Plaintiff, | ) |
| vs. | ) ) |
| (1) AUBREY K. MCCLENDON, (2) RICHARD K. DAVIDSON, (3) FRANK KEATING, (4) BREENE M. KERR, (5) CHARLES T. MAXWELL, (6) DON NICKLES, (7) FREDERICK B. WHITTEMORE, (8) MARCUS C. ROWLAND, (9) MICHAEL A. JOHNSON, and (10) MERRILL A. MILLER, JR., | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| (11) CHESAPEAKE ENERGY CORPORATION, an Oklahoma corporation, | ) ) ) ) |
| Nominal Defendant. | ) ) |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff M. Lee Arnold ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of nominal defendant Chesapeake Energy Corporation ("Chesapeake" or the "Company") against certain current and former members of its Board of Directors (the

"Board") and executive officers seeking to remedy the defendants' misconduct. Plaintiff makes the following allegations based upon individual and personal knowledge as to his own acts, and the investigation undertaken by his undersigned counsel as to other matters, which investigation included, among other things, an analysis of U.S. Securities and Exchange Commission ("SEC") filings by Chesapeake as well as securities analysts' reports and advisories about the Company, media reports about the Company, and press releases issued by the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Chesapeake is North America's third largest producer of natural gas. It owns interests in more than 40,000 natural gas and oil-producing wells that are currently producing more than 2 billion cubic feet equivalent per day. Chesapeake's strategy is to discover, acquire, and develop conventional and unconventional natural gas reserves. The Company is headquartered in Oklahoma City, Oklahoma. Chesapeake's shares trade on the New York Stock Exchange.

2.      On July 15, 2008, the defendants caused Chesapeake to complete a stock offering (the "Stock Offering") of 28.75 million shares of common stock (including the underwriters' 3.75 million overallotment) at $57.25 per share.   Chesapeake received approximately $1.65 billion in gross proceeds and $1.586 billion in net proceeds.

3.      In the Stock Offering's registration statement (the "Registration Statement"), the defendants failed to disclose numerous material facts.  These included the risks associated with the aggressive use of knockout swaps, the Company's financial exposure to Lehman Brothers, Inc. ("Lehman Brothers"), and the high prices paid for land leases.

4.      The defendants failed to disclose that the Company's exposure to natural gas price declines was not adequately limited by Chesapeake's hedging activities.  A

growing proportion of the hedging agreements covering Chesapeake's 2008 and 2009 production contained "knockout" provisions that eliminated the counterparty's financial obligations once the price of natural gas fell below a certain benchmark. As natural gas prices approached this level, Chesapeake was forced to renegotiate the hedging contracts and accept unfavorable terms, costing the Company hundreds of millions of dollars.

5.      The defendants also failed to disclose that Lehman Brothers was a counterparty to a portion of the Company's natural gas hedging contracts. At the time of the Stock Offering, analysts and investors knew that Lehman Brothers was facing financial difficulties and strongly suspected that the firm would face bankruptcy. For example, one analyst report stated that "[i]nvestors believe that [Lehman Brothers] might be the next candidate for bankruptcy in the brokerage arena." Additionally, on March 18, 2008, *The Wall Street Journal* reported that Lehman Brothers "could face the same kind of liquidity squeeze as Bear Stearns."

6.      Investors and analysts' concerns were later proved to be well-founded when Lehman Brothers declared bankruptcy in September 2008, a mere two months after the Stock Offering. Despite the materiality of Lehman Brothers' position as a counterparty to Chesapeake's hedging contracts, this fact was not disclosed in the Registration Statement.

7.      Additionally, the Individual Defendants did not disclose that Chesapeake's lease brokers had agreed to higher prices in lease and royalty contracts in the months leading up to the Stock Offering. This caused Chesapeake to pay unreasonably high prices for contracts in certain drilling areas and contributed to Chesapeake's liquidity problems.

8.      During late 2008 and early 2009, as the material facts not disclosed in the Registration Statement were eventually revealed to the public, the price of Chesapeake stock declined to less than $12 per share, or approximately 80% below the Stock Offering price. As a result of the defendants' misconduct, Chesapeake's ability to raise capital and borrow funds has been impaired, its common stock has begun trading at reduced

multiples of earnings, it has incurred substantial costs defending an ongoing securities fraud class action, it has experienced increased premiums for its directors and officers liability insurance, and its corporate image and goodwill have been damaged.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a). The acts and transactions that gave rise to the violations of law asserted in this complaint occurred in this District. The misconduct complained of herein occurred in substantial part in this District, including the preparation and dissemination of materially false and misleading statements and the omission of material information complained of herein.

## THE PARTIES

11.     Plaintiff is a current shareholder of Chesapeake and has continuously held Chesapeake stock at all relevant times. Plaintiff is a citizen of Missouri.

12.     Nominal defendant Chesapeake is an Oklahoma corporation with principal executive offices located at 6100 North Western Avenue, Oklahoma City, Oklahoma.

13.     Defendant Aubrey K. McClendon ("McClendon") has served as Chairman of the Board and Chief Executive Officer ("CEO") of the Company since 1989, when he co-founded Chesapeake. Defendant McClendon signed the Registration Statement. Defendant McClendon is a citizen of Oklahoma.

14.     Defendant Richard K. Davidson ("Davidson") has served as a director of the Company since 2006. In addition, defendant Davidson served as a member of the

Board's Audit Committee (the "Audit Committee") since 2006. Defendant Davidson is a citizen of Florida.

15.     Defendant Frank Keating ("Keating") has served as a director of the Company since 2003. Defendant Keating signed the Registration Statement. Defendant Keating is a citizen of Virginia.

16.     Defendant Breene M. Kerr ("Kerr") served as a director of the Company from 1993 until June 12, 2009. In addition, defendant Kerr served as a member of the Audit Committee since 1993.   Defendant Kerr signed the Registration Statement. Defendant Kerr is a citizen of Maine.

17.     Defendant Charles T. Maxwell ("Maxwell") has served as a director of the Company since 2002. Defendant Maxwell signed the Registration Statement. Defendant Maxwell is a citizen of New York.

18.     Defendant Don Nickles ("Nickles") has served as a director of the Company since 2005. Defendant Nickles signed the Registration Statement. Defendant Nickles is a citizen of Virginia.

19.     Defendant Frederick B. Whittemore ("Whittemore") has served as a director of the Company since 1993. Defendant Whittemore signed the Registration Statement. Defendant Whittemore is a citizen of New York.

20.     Defendant Marcus C. Rowland ("Rowland") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") from 1992 until October 29, 2010. Defendant Rowland signed the Registration Statement. Defendant Rowland is a citizen of Oklahoma.

21.     Defendant Michael A. Johnson ("Johnson") has served as the Company's Senior Vice President of Accounting, Controller, and Chief Accounting Officer since 2000. Defendant Johnson signed the Registration Statement. Defendant Johnson is a citizen of Oklahoma.

22.     Defendant Merrill A. Miller, Jr. ("Miller") has served as a director of the Company since 2007. In addition, defendant Miller served as a member of the Audit Committee since 2007. Defendant Miller is a citizen of Texas.

23.     Collectively, defendants McClendon, Davidson, Keating, Kerr, Maxwell, Nickles, Whittemore, Rowland, Johnson, and Miller are referred to herein as the "Individual Defendants."

24.     Collectively, defendants Davidson, Kerr, and Miller are referred to as the "Audit Committee Defendants."

## THE INDIVIDUAL DEFENDANTS' DUTIES

25.     By reason of their positions as officers, directors, and fiduciaries of Chesapeake and because of their ability to control the business and corporate affairs of Chesapeake, the Individual Defendants owed and owe Chesapeake fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Chesapeake in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Chesapeake and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Chesapeake and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

26.     The directors also have a duty to inform themselves of all material information reasonably available to them prior to making a business decision. Upon receipt of a litigation demand, the directors must investigate and evaluate the charges in order to discharge their duty to the shareholders and the Company. The directors must review all information necessary to objectively and meaningfully evaluate the demand.

27.     To discharge their duties, the officers and directors of Chesapeake were and are required to exercise reasonable and prudent supervision over the management,

policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Chesapeake were and are required to, among other things: (a) exercise good faith to ensure that the affairs of the Company are conducted in an efficient, business-like manner and provide the highest quality of performance; (b) exercise good faith to ensure that the Company is operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, and regulations, and all contractual obligations, including acting only within the scope of its legal authority; (c) when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to conduct an investigation, correct the misconduct, and prevent its recurrence; (d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time and ensure that the Company maintains an adequate system of financial controls such that the Company's financial reporting is true and accurate at all times; (e) remain informed as to how Chesapeake conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; (f) ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations; (g) and ensure that Chesapeake's public filings and stock offerings were prepared in accordance with applicable SEC regulations and rules governing their preparation.

28.     Pursuant to the Audit Committee's Charter, its members were and are assigned the following responsibilities:

> (a)     Discuss with management any major issues regarding the adequacy of the Company's internal controls;
>
> (b)     Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control these exposures;

(c)     Discuss with management the guidelines and policies governing the process by which risk assessment and risk management is undertaken;

(d)     Discuss with management the Company's earnings press releases and earnings guidance provided to analysts and ratings agencies;

(e)     Review, prior to filing, the Company's annual and quarterly reports;

(f)     Oversee any legal, compliance, or regulatory issues that might have a material effect on the Company's financial statements or compliance policies; and

(g)     Investigate material matters brought to the committee's attention that are within the scope of its duties.

29.    The members of the Audit Committee had a fiduciary duty to ensure that Chesapeake's public filings and stock offerings were prepared in accordance with applicable SEC regulations and rules governing their preparation.

30.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Chesapeake, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Chesapeake, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

31.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Chesapeake, the absence of good faith on their part, and a disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The Individual Defendants had knowledge of and were aware of the undisclosed facts and omitted information by virtue of their positions as officers and directors at Chesapeake. The Individual Defendants breached their duties of loyalty, care, and good faith by allowing defendants to cause, or by themselves causing, the Company to disseminate to the market materially

inaccurate and incomplete statements in the Registration Statement, the prospectus, public filings, and public statements, as detailed herein.

## THE STOCK OFFERING

32.    On or about December 8, 2005, the Individual Defendants caused Chesapeake to file with the SEC a Form S-3ASR Registration Statement and Prospectus (the "Prospectus") using a "shelf" registration or continuous offering process. Under the shelf, Chesapeake would be permitted to sell securities in one or more offerings.

33.    Form S-3 is a stream-lined registration statement for certain well-capitalized, widely followed issuers. Such issuers are permitted to file scaled down registration statements and incorporate by reference prior periodic filings such as Forms 10-K and 10-Q. Pursuant to Instruction 11(a) of Form S-3, an issuer utilizing Form S-3 must disclose all material changes in the registrant's affairs that have occurred since the end of the last fiscal year for which certified financial statements were included in the last annual report to shareholders and which were not described in a report on Form 10-Q or Form 8-K filed under the Securities Exchange Act of 1934.

34.    Issuers utilizing Form S-3 are required to update the information in their periodic filings, including information concerning "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations," which is required to be disclosed in SEC periodic filings pursuant to Item 303(a) of Regulation S-K. Under Item 303(a), issuers are required to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

35.    Chesapeake's Form S-3ASR incorporated by reference subsequently filed prospectuses:

> [F]or the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new

registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

36.     Chesapeake's Form S-3ASR also included assurances that the registrant would:

> [R]eflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement.

37.     On July 8, 2008, the Individual Defendants caused Chesapeake to announce that it would conduct a common stock offering of 25 million shares. The release also stated that Lehman Brothers and UBS Investment Bank would be the joint book-running managers for the Stock Offering.

38.     On July 9, 2008, the Individual Defendants caused Chesapeake to announce the pricing of its common stock offering in a release that stated in part:

> Chesapeake Energy Corporation today announced that it has priced a public offering of 25 million shares of its common stock at $57.25 per share. The company has also granted the underwriters a 30-day option to purchase a maximum of 3.75 million additional shares of its common stock. Chesapeake expects the issuance and delivery of the shares to occur on July 15, 2008, subject to customary closing conditions.

39.     On or about July 10, 2008, the Individual Defendants caused the Company to file a definitive prospectus supplement, which amended and became part of the Prospectus. The definitive prospectus supplement and the Prospectus are referred to herein as the "Prospectus." The Prospectus incorporated by reference Chesapeake's Form 10-K for the year ending December 31, 2007 and its Form 10-Q for the three months ending March 31, 2008. The Prospectus also incorporated by reference the Company's Schedule 14A filed on April 29, 2008, some of the Company's Form 8-Ks filed with the SEC, including the Company's 8-Ks that were filed on January 4, 2008, January 24, 2008, March 20, 2008, March 26, 2008, April 1, 2008, April 16, 2008, April 18, 2008, May 12,

2008, May 23, 2008, May 27, 2008, May 29, 2008, June 4, 2008, June 11, 2008, June 12, 2008, July 8, 2008, and July 9, 2008 (excluding any information furnished pursuant to Item 2.02 or Item 7.01 of any such Current Report on Form 8-K); and Chesapeake's Registration Statement on Form 8-B (File No. 001-13726) that was filed on December 12, 1996, as amended by its Current Report on Form 8-K that was filed on March 26, 2008.

## MATERIAL FACTS NOT DISCLOSED IN THE REGISTRATION STATEMENT

40.    In connection with the Registration Statement and the Prospectus, the Individual Defendants issued untrue statements of material fact, omitted to state other facts that were necessary to make the statements not misleading, and failed to ensure that they were prepared in accordance with applicable SEC regulations and rules governing their preparation.

41.    The Individual Defendants' misconduct in this regard constituted a breach of their fiduciary duties of care, loyalty, and good faith as well as their duty to properly manage the Company. Additionally, their misconduct constituted an abuse of their control and influence over Chesapeake, for which they are legally responsible. Further, the Individual Defendants abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Chesapeake.

42.    The Audit Committee Defendants had heightened duties and responsibilities to ensure the accuracy of the Registration Statement, the Prospectus, and the public filings incorporated therein. They were required to ensure that the offering documents were prepared in accordance with applicable SEC regulations and rules governing their preparation, and that there were no untrue statements of material fact or omissions of facts necessary to make the statements not misleading. The Audit Committee Defendants improperly allowed the Company to disseminate to the market materially inaccurate and incomplete statements in the Registration Statement, the Prospectus, public filings, and public statements, as detailed herein. They also failed to

ensure that Chesapeake's public filings and stock offerings were prepared in accordance with applicable SEC regulations and rules governing their preparation. The Audit Committee Defendants' misconduct constituted a breach of their fiduciary duties to the Company.

## NON-DISCLOSURES REGARDING KNOCKOUT SWAPS

43.     Natural gas companies often enter into hedging contracts to mitigate risks associated with market volatility. Hedging routinely affects more than 80% of Chesapeake's natural gas production, which is more than for its competitors. CEO defendant McClendon is closely involved in hedging activities and regularly reports to investors regarding the success of the Company's derivative instruments.

44.     There are many types of hedging contracts that are used by natural gas companies. Chesapeake regularly uses swaps, knockout swaps, and collars.

45.     A swap is an arrangement in which a party receives a pre-determined price for a specified volume of natural gas in exchange for an up-front fee. For example, Chesapeake might enter into a swap in which it would receive the fixed price of $10 per mcf for one million mcf and pay an upfront fee of $200,000. If the price of natural gas ends up being $9 per mcf, then Chesapeake is paid the difference between the market price and the agreed upon price, multiplied by the quantity of gas involved. At $9 per mcf, Chesapeake would receive one million dollars. Taking into account the upfront fee, Chesapeake would have increased revenues by $800,000. Conversely, if the price of natural gas ended up at $11 per mcf, then Chesapeake would have lost a total of $1.2 million by entering into the swap.

46.     The party with which Chesapeake enters into the swap is called the counterparty.

47.     A knockout swap is a swap that terminates if the price of natural gas falls below a pre-established level. When this occurs, neither party is required to perform under the contract. For example, Chesapeake might enter into a hedging agreement to

receive a fixed price of $9 per mcf with a knockout level of $6.25 per mcf. If gas is below $6.25 per mcf on the day of settlement, neither party owes the other anything. However, if gas is at or above $6.25 per mcf, the counterparty pays Chesapeake the fixed amount of $9 per mcf. Because the knockout provisions provide some downside protection, the counterparty pays a higher price for natural gas than would be the case if the parties entered into a conventional swap contract. The natural gas producer thus receives more revenue while being exposed to the risk of the price falling below the knockout price.

48.     A collar is an agreement designed to limit exposure to price fluctuations by setting both an upper limit and a lower limit on the price at which natural gas will be sold. If the market price rises above the upper limit, the company pays the counterparty the difference between the upper limit price and the market price. If the market price falls below the lower limit, the counterparty pays the company the difference between the lower limit price and the market price.

49.     If a natural gas company is willing to accept the risks involved with knockout swaps, they can generally receive a higher fixed price for their gas. However, if prices drop dramatically, the company is left unprotected and receives only the lower market price. For this reason, most natural gas companies use knockout swaps as a relatively small component of their hedging strategy. The Individual Defendants, however, routinely used knockout swaps to cover up to one-third of their production. The Individual Defendants failed to disclose the risks associated with their aggressive use of knockout swaps.

50.     The Individual Defendants claimed that their hedging activities substantially increased revenues over the years. Chesapeake's Senior Vice President Jeffrey L. Mobley stated in a Credit Suisse Group Energy Conference on February 5, 2008 that "we are the number one hedger in the industry, having realized gains of about

$2.2 billion over the last seven quarters." He also stated in regards to the Company's hedging track record, "[w]e've been real pleased with our results to date."

51.     Given the impact that hedging has on the Company's bottom line, the SEC asked the Company to provide additional information about its hedging activities. On May 30, 2008, the Division of Corporate Finance of the SEC sent a letter to Chesapeake's Board. In this correspondence, the SEC took issue with the inadequacy of Chesapeake's disclosures regarding its hedging activities, stating the following:

> We note the impact of realized gains on oil and natural gas derivatives in your total sales for Fiscal Year 2007, 2006 and 2005 and your reported derivative positions as of December 31, 2007. We further note on page 3 of this filing you have hedged 87% of your expected 2008 natural gas production and 94% of your expected 2008 oil production. *Include a discussion of any known trends or uncertainties related to your derivative positions that you reasonably expect will have a material favorable or unfavorable impact on net sales or tell us why you are unable to provide this discussion. Refer to Regulation S-K Item 303(a)(3)(ii).*

52.     In requesting this information, the SEC indicated that the Individual Defendants had not made the necessary disclosures that the investing public would find material. The SEC also indicated that the Individual Defendants had not supplied the information discussed in Item 303(a)(3)(ii) of Regulation S-K.

53.     The Individual Defendants sent a response letter to the SEC that did not contain the requested information. Rather, it provided a brief overview of the types of information previously disclosed, stating the following:

> The company provided a comprehensive listing of its derivative positions as of December 31, 2007 on pages 55-57 in Item 7A, and we further provided an updated hedged percentage as of a current date on page 34 under "Liquidity and Capital Resources." Our natural gas and oil derivatives allow us to predict with greater certainty the revenue we will receive for our hedged production, but we cannot predict the gains or losses we will realize from the derivatives. Gains or losses on open derivatives will be determined by future natural gas and oil prices at the time of settlement. Historically, the markets for natural gas and oil have

been volatile and they are likely to continue to be volatile. We employ hedges primarily to mitigate the downside of price volatility but cannot reasonably predict what prices will be in future periods. We have disclosed on page 56 the aggregate amount of gains ($215 million as of December 31, 2007) we will realize in future periods, from 2008 through 2022, as a result of natural gas and oil hedges we have settled prior to maturity. Those gains are locked in and are not subject to future price changes.

54.     The Individual Defendants' letter was not responsive to the SEC's request and did not provide the necessary disclosures. The information requested by the SEC was also required to be included in the Prospectus that was filed approximately four weeks later. However, this information was not provided and the Prospectus lacked the necessary disclosures.

55.     In a similar vein, the need for supplemental disclosures pertaining to hedging activities was also recognized by the analysts who followed Chesapeake. During conference calls, analysts routinely requested that CEO defendant McClendon and CFO defendant Rowland shed more light on the effectiveness of the Company's hedges. Additionally, these analysts frequently discussed the hedges in their reports and often included them when predicting the future performance of the Company.

56.     Despite the enormous impact that hedging activities had on revenues, profit, and shareholder returns, the disclosures provided by the Individual Defendants were wholly inadequate.  In its public filings, the Individual Defendants disclosed generally that revenues were impacted by the price of natural gas and the effectiveness of their hedges.  They also disclosed the types of hedging contracts that they used and provided a brief description of the manner in which each instrument operated. Additionally, they provided a chart containing information about open hedges. This chart listed the volume of gas affected and the price to be received.

57.     However, the Individual Defendants provided little information regarding the results of past hedges other than to provide a single figure representing quarterly losses or gains from hedges. This figure was problematic because it lumped together six

types of hedges covering two types of commodities. There was no transparency regarding the prior effectiveness of knockout swaps or whether the price of natural gas had fallen below the knockout price. Without such information, it was difficult, if not impossible, for investors to predict the future impact that open knockout swaps would have on revenues and income. This is especially the case given that open derivative instruments are routinely renegotiated and that updated disclosures to hedging activities are not provided with sufficient frequency to accurately model or predict the expected impact on revenues.

58.   Additionally, the Individual Defendants never disclosed that when natural gas approaches prices at which knockout provisions will be triggered, the Company is all but required to renegotiate the knockout swaps into straight swaps or collars with terms that are far less favorable than those the Company would have obtained if they had originally entered into straight swaps or collars rather than knockout swaps.

59.   When the price of natural gas fell in the second half of 2008, some of the knockout provisions were triggered and Chesapeake received no money under the hedging instruments. However, for the vast majority of the knockout swaps, the Individual Defendants were forced to renegotiate the hedges on unfavorable terms. During a two or three week period in or around October 2008, defendant McClendon and his team put forth a concentrated effort to get rid of as many knockout swaps as possible. During this process, the Individual Defendants treated the knockout swaps as if they were toxic. The contracts were renegotiated at terms that were highly disadvantageous to Chesapeake. Through the rest of 2008 and during the first half of 2009, the Individual Defendants continued to renegotiate the knockout swaps and continued to agree to terms that were unfavorable to Chesapeake.

60.   Had the Individual Defendants avoided knockout swaps in the first place and entered into collars and straight swaps, the Company would have received several hundred million dollars more than they received under the renegotiated contracts. The

possibility that this would occur was material and should have been disclosed by the Individual Defendants in the Prospectus and the Registration Statement.

61.    Deutsche Bank estimated in an analyst report that knockout swaps would cost Chesapeake $460 million in 2009.  No information has been provided regarding the impact on 2008 financials.  However, the loss was likely several hundred million dollars.  At the time of this filing, the Individual Defendants have not disclosed their predicted or actual loss from using knockout hedges in 2008 or 2009.  It is highly likely that the amount of money involved was material to the Company and that the undisclosed information would have been considered material to the investing public.  Even if the total loss was only $460 million, this amount was material to the Company.

62.    The Individual Defendants have treated amounts as small as $1 million as material and worth reporting to the investing public.  For example, in a Form 10-Q filed on November 9, 2009, the Individual Defendants referred to costs that totaled $1 million on at least six different occasions.  Values that appeared to be less than $1 million were deemed by the Individual Defendants to be nominal and were not disclosed.  This occurred at least twice in the Form 10-Q filed on November 9, 2009.

63.    As it relates to hedges, the Individual Defendants have treated amounts as small as $4 million as being material.  For example, in the Form 10-Q filed on May 12, 2008, less than two months before the Stock Offering, the Individual Defendants disclosed that the cumulative unrealized loss on fixed-price natural gas collars was $4 million.  They went on to state that the unrealized premiums related to these collars were nominal, implying that there was no need to disclose this information because it was not material.  In making these statements, the Individual Defendants indicated that losses as small as $4 million for a particular type of hedge were material and should be disclosed.  Given this standard for materiality, the predicted $460 million loss due to knockout swaps was material.

64.    Failing to include the above-described disclosures concerning knockout swaps in the Registration Statement and Prospectus caused the statements contained therein to be misleading.

65.    Additionally, the failure to disclose this information caused the Individual Defendants to not comply with Item 303(a) of Regulation S-K, which requires issuers to describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  The Individual Defendants knew that natural gas prices could rise and fall suddenly, which would cause the knockout swaps to become ineffective and/or require the Company to renegotiate the contracts under unfavorable conditions.  In the five years prior to the Stock Offering, there were at least four quarters in which knockout provisions had been triggered because the price of natural gas had fallen significantly.  Because this had occurred in the past, the Individual Defendants knew or should have known that this was a future possibility.

66.    Further, the Individual Defendants later admitted that they expected the market to collapse.  Defendant McClendon stated in a conference call with analysts on February 18, 2009: "[w]e anticipated this downturn and got ready for it and built several competitive advantages that are, again, unique."  McClendon also made the following statements at an energy conference on September 2, 2008: "we had reached a point where we didn't think gas prices were likely to go up much higher;" "[w]e anticipated a time of natural gas surplus;" "we thought gas prices were going to be ranged down for a while;" and "we positioned ourselves in anticipation of this."  Given that the Individual Defendants were aware that the price of natural gas could fall and reach a point that would trigger the knockout provisions, they were required to disclose this material information in the Prospectus and the Registration Statement.

67.    Additionally, at the time of the Stock Offering, there were several red flags that pointed to natural gas prices dropping in the near future, including the following:

natural gas prices had risen approximately 85% in the six months prior to the Stock Offering; natural gas prices were at an all-time high around the time of the Stock Offering; the economy had slowed down and entered into a recession; demand for natural gas had declined as a result of the shrinking economy; the amount of natural gas being supplied and produced on a daily basis was approximately 4 billion cubic feet higher in 2008 than in 2007; significant new natural gas reserves had been located in the past twelve months and were already producing significant quantities of gas; approximately 30% of domestic natural gas production came from wells placed in service in the year prior to the Stock Offering; the price of natural gas had been artificially inflated by the presence of speculators and day traders; and land lease prices had reached all-time highs in several areas. As a result of these red flags, the Individual Defendants knew or should have known that the underlying data indicated that supply had outpaced demand, that a price correction would occur in the near future, and that their aggressive use of knockout swaps might leave the Company unprotected. Given their awareness of uncertainties in the natural gas market and the possibility that a negative price trend would have a material, unfavorable impact on net sales, revenues, and income, the Individual Defendants were required to include disclosures regarding their aggressive use of knockout swaps in the Prospectus and the Registration Statement.

## FAILURE TO DISCLOSE CHESAPEAKE'S EXPOSURE TO LEHMAN BROTHERS' DETERIORATING FINANCIAL CONDITION

68.     The Individual Defendants improperly failed to disclose Chesapeake's hedging exposure to Lehman Brothers.  By at least July 2008, Lehman Brothers' deteriorating financial condition had significantly diminished the likelihood that Lehman Brothers and/or its subsidiaries would be able to pay Chesapeake the agreed-upon prices under the hedging contracts.  The Individual Defendants did not disclose in the Registration Statement that Lehman Brothers and/or its subsidiaries were counterparties

to a material portion of the contracts that hedged Chesapeake's oil and natural gas production.

69.    The Registration Statement, the Prospectus, and the public filings incorporated therein provided some information regarding Lehman Brothers that the Individual Defendants apparently deemed material.  For example, the Prospectus stated that Lehman Brothers provided investment banking and advisory services to Chesapeake, was a party to Chesapeake's revolving bank credit facility, that an affiliate of Lehman Brothers was a participant in a drilling business with Chesapeake, and that another affiliate was the owner of an entity to which the Company made sales that represented 15% of its total revenue in 2007.  However, the Individual Defendants did not disclose the potential exposure to Chesapeake caused by entering into hedging contracts with Lehman Brothers.

70.    Hedging activities expose natural gas companies to counterparty credit risk. If counterparties are unable to meet their obligations under a hedging contract because of liquidity problems or solvency concerns, then a natural gas company is unlikely to receive the agreed-upon price.  Because of this risk, most natural gas companies monitor the creditworthiness of each of their counterparties.   Some natural gas companies establish credit limits according to their credit policies and guidelines.  Some companies require cash collateral or letters of credit to mitigate credit-risk exposure.

71.    Given Chesapeake's exposure to Lehman Brothers' deteriorating financial condition, the rules and regulations governing the preparation of the Registration Statement and the Prospectus required the Individual Defendants to disclose that Lehman Brothers was the counterparty for a material amount of the Company's hedging contracts and that the Company could suffer material losses if Lehman Brothers were unable to perform under the contracts.

72.    By the time the Stock Offering took place, concerns about Lehman Brothers' liquidity and creditworthiness were growing in the financial community. After

the March 2008 collapse of Bear Stearns in the midst of the credit crisis, fears lingered that other investment banks such as Lehman Brothers might also be on the verge of insolvency due to heavy losses suffered from investments in risky mortgage-backed securities.

73.     Those fears were confirmed on June 6, 2008, when Lehman Brothers reported a preliminary loss projection for the second quarter of 2008. Shortly thereafter, on June 12, 2008, Lehman Brothers announced the resignations of its President and Chief Operating Officer, Joseph Gregory, and CFO Erin Callan. By June 13, 2008, Lehman Brothers' stock price had fallen 61% in less than six months.

74.     Lehman Brothers announced on June 16, 2008, that it would record a net loss for the second quarter of 2008 of $2.8 billion, or $5.14 per share. This was its first quarterly loss since becoming a publicly-traded company in 1994. Lehman Brothers also reported negative revenues for the second quarter of 2008 of $668 million. This was down from revenues of $5.51 billion in the second quarter of 2007. The losses stemmed from a $4.1 billion write-down of investments, many of which were tied to investments in subprime mortgage-backed securities. Lehman Brothers also announced its plans to offset the loss by raising $6 billion in capital, which brought the total amount of new capital raised since the beginning of 2008 to $14 billion. Lehman Brothers also conceded that additional capital infusions would likely be required.

75.     Under pressure from the Federal Reserve, Lehman Brothers subsequently closed a $4.0 billion public offering of common stock. It also closed a $2.0 billion public offering of preferred stock on unfavorable terms, which caused its share price to plunge. Additionally, Lehman Brothers decreased its leverage ratio by unloading $130 billion in assets and reducing its exposure to residential and commercial mortgages.

76.     Following these announcements, investors questioned why Lehman Brothers was periodically raising new capital and why its write-downs were significantly larger than in previous quarters. The announcements fueled speculation that Lehman

Brothers had greater exposure to mortgage-backed securities than it had disclosed and that its reported book value might not be accurate.

77.     By July 4, 2008, Lehman Brothers' stock price had declined 65.8% since the beginning of the year. The *Economist Intelligence Unit* reported that investor concern was mounting that Lehman Brothers could face substantial additional losses on non-securitized subprime loans and other assets affected by the economic downturn. Analysts also predicted that Lehman Brothers' mortgage assets would deteriorate even further.

78.     On July 8, 2008, *Reuters* reported that Lehman Brothers had been suspended from participating in an oil trading pricing platform because of mounting market concern about its credit worthiness.

79.     The next day, Federal Reserve Chairman Ben S. Bernanke, indicated that struggling investment banks would not be bailed out on the grounds they were "too big to fail." According to an article published by *The Associated Press* on July 14, 2008, this announcement marked "a shift to a new and potentially more volatile phase of the credit crisis" since "beaten-down investment banks like Lehman Brothers ... must now fend for themselves as they try to recover from billions of dollars in mortgage-related losses unlike Bear Stearns, whose buyout the government helped orchestrate in March."

80.     On September 15, 2008, Lehman Brothers filed for Chapter 11 bankruptcy protection.

81.     The above-described developments alerted the Individual Defendants to the deteriorating financial condition of Lehman Brothers. The Individual Defendants knew or reasonably should have known that there was a significant chance that Lehman Brothers would not be able to continue as a going concern. Although Lehman Brothers attempted to reassure the market regarding its financial strength on several occasions, their unconvincing pronouncements carried little weight.

82.     The Individual Defendants must have been acutely aware of Chesapeake's exposure to the investment bank's financial problems given that Lehman Brothers was

acting as one of the lead underwriters for the Stock Offering. It was impossible for the Individual Defendants to not be aware of the potential liability that came from their close dealings with the ailing Wall Street firm. The Individual Defendants should have disclosed the Company's potential exposure to Lehman Brothers' deteriorating financial condition to the investing public. Their failure to do so made the statements contained in the Registration Statement and Prospectus misleading.

83.    The full impact of the loss caused by the hedging contracts with Lehman Brothers has still not been disclosed by the Individual Defendants. At the time of the Stock Offering, the Individual Defendants had not disclosed that they entered into hedging contracts with Lehman Brothers or that the ability of Lehman Brothers to perform under the contracts was severely impinged by its recent financial struggles. The Individual Defendants made no attempt to determine the loss that might result from Lehman Brothers' nonperformance.

84.    On October 10, 2008, Chesapeake issued a press release entitled "Chesapeake Energy Corporation Announces 2008 Investor and Analyst Meeting Major Topics." In the press release, defendants disclosed the Company's financial exposure to Lehman Brothers. Specifically, the press release stated:

> Lehman Brothers' Exposure: The company's financial exposure to Lehman Brothers included amounts for unpaid natural gas sales and amounts due and owing under various derivative contracts. Chesapeake received cash payment for all natural gas physically marketed through a former affiliate of Lehman Brothers, Eagle Energy Partners I, L.P., when Electricite de France SA acquired Eagle last month. With respect to the loss on the terminated derivative contracts, the company estimates that the amount by which the net value of financial natural gas and oil hedges with Lehman exceed the amount anticipated to be received by the company from selling or rehedging the gas will not exceed $50 million.

85.    This muddled disclosure by the Individual Defendants was a day late and a dollar short. It fails to provide shareholders with the costs and premiums associated with entering into new hedges to replace those previously entered into with Lehman Brothers.

Additionally, it does not provide the volume of natural gas affected by the hedging contracts with Lehman Brothers. Further, it does not reveal the type of hedging contracts at issue or the amount of money lost from the contracts. Finally, in providing the "net value," the Individual Defendants do not state what was or was not included in calculating this figure.

86.     In a Form 10-Q filed on November 9, 2009, the Individual Defendants disclosed that the current loss recorded for Lehman Brothers' counterparty default was approximately $15 million. This figure did not take into account the results of all of the replacement hedges entered into after the termination of the Lehman Brothers contracts. Additionally, this figure provides little transparency into the actual loss caused by the Lehman Brothers hedges. Similar to the inadequate disclosure made more than a year earlier in October 2008, the Individual Defendants failed to provide shareholders with the costs associated with entering into new hedges to replace those previously entered into with Lehman Brothers. They also did not provide the volume of natural gas affected by the hedging contracts with Lehman Brothers. Further, they did not reveal the type of hedging contracts at issue or the amount of money lost from the contracts. Finally, they did not state what was or was not included in calculating the $15 million figure.

87.     However, even if the loss were just $15 million, which it likely was not, this amount was material to Chesapeake's income and to the effectiveness of their hedging activities. As discussed above, the Individual Defendants have treated amounts as small as $1 million as material and worth reporting to the investing public. Gains or losses of just $1 million are routinely disclosed by the Individual Defendants in their periodic public filings. As it relates to hedges, the Individual Defendants have treated amounts as small as $4 million as being material. Accordingly, a loss of just $15 million would be material to Chesapeake.

## NON-DISCLOSURES REGARDING LAND LEASE COSTS

88.    In the Registration Statement and the Prospectus, the Individual Defendants also failed to disclose the impact that Chesapeake's lease brokers, or land men, were having on the price of leasing natural gas development rights in Chesapeake's prime areas of development.   As gas prices rose and new deposits of natural gas were discovered, a land-rush occurred that involved most of the major natural gas producers.   Chesapeake aggressively participated in the land-rush, and its land men bid up the price of leases to new highs.  In one area of West Virginia, lease rates increased by more than 1000%.  A similar situation occurred in certain parts of New York.  An analyst from Deutsche Bank stated on June 6, 2008, that leasing costs in some areas had spiraled up to $10,000 - $15,000 per acre, while they were just hundreds of dollars per acre earlier in the year.  As a result of the land men's bidding practices, Chesapeake's lease and royalty contracts bore no rational relation to the value that could be realized from selling the natural gas underlying the contracts.

89.    The Individual Defendants knew they were paying inflated prices for the land leases and that the value of such leases was likely to fall in the future.   The Individual Defendants were aware that the value of land leases was closely tied to the market price for natural gas.  Indeed, the Company was and is required to constantly adjust the value given to its land holdings through a process called "mark to market." When natural gas prices fell, the Individual Defendants were forced to write down the value of their assets by more than $6 billion.  Their understanding of the correlation between gas prices and the value of land caused them to be aware that the bubble in natural gas prices had caused land prices to increase dramatically.  They also knew that once the price of natural gas fell, the value of land leases would decrease and would be much cheaper to acquire.   Accordingly, the Individual Defendants knew that the Company was not receiving adequate value from its aggressive acquisition program that

was being carried out during a period of unprecedented land prices. They also knew that Chesapeake was substantially overpaying to acquire new drilling opportunities.

90.    The following red flags pointed to land prices being overinflated and eventually dropping once the price of natural gas fell: natural gas prices had risen approximately 85% in the six months prior to the Stock Offering; natural gas prices were at an all-time high around the time of the Stock Offering; the economy had slowed down and entered into a recession; demand for natural gas had declined as a result of the shrinking economy; the amount of natural gas being supplied and produced on a daily basis was approximately 4 billion cubic feet higher in 2008 than in 2007; significant new natural gas reserves had been located in the past twelve months and were already producing significant quantities of gas; approximately 30% of domestic natural gas production came from wells placed in service in the year prior to the Stock Offering; the price of natural gas had been artificially inflated by the presence of speculators and day traders; and land lease prices had reached all-time highs in several areas. As a result of these red flags, the Individual Defendants knew or should have known that the underlying data indicated that supply had outpaced demand, that a price correction would occur in the near future, that Chesapeake was purchasing land at inflated prices, and that the value of their assets would drop in the near future when the price of natural gas fell.

91.    Defendant McClendon later admitted in a conference call on October 31, 2008, that there had been a "dramatic reduction in leasehold values" and that it "no longer made sense to pay $15,000, $20,000, [or] $25,000 an acre." The fact that Chesapeake overpaid for its leases is demonstrated by its attempt to later renegotiate a significant portion of them, as discussed in a conference call on February 18, 2009. During this call, it was disclosed that the Individual Defendants had attempted to meet some of their obligations to pay under the leases by offering up the Company's stock. The motivation for offering stock instead of cash, especially at a time when the Company's stock had lost most of its value, was that Chesapeake was experiencing an

acute cash crunch that was largely caused by overpaying for leases. McClendon admitted in an energy conference on September 2, 2008, that "we really couldn't afford [the land leases] at the time."

92.    The Individual Defendants caused the Company to pay $8.5 billion to acquire properties in 2008. This enormous amount was 2.5 times more than what the Company paid in 2007. Additionally, this figure dwarfed net income for 2008, which was just $723 million. The amount of money paid for leases is also remarkable when compared to the Company's total revenues for 2008, which amounted to just $11.6 billion. The Individual Defendants used 73% of every dollar that came into the Company in 2008 to purchase land at inflated prices. This aggressive acquisition strategy was unheard of in the industry, led to significant cash shortfalls, and caused numerous rumors about Chesapeake's potential insolvency.

93.    The Company's cash problems caused the Individual Defendants to issue 23 million shares of stock just three months before the Stock Offering and more than one billion dollars worth of senior notes just two months before the Stock Offering. Four months after the Stock Offering, the Individual Defendants announced that Chesapeake would sell 50 million additional shares, which caused Chesapeake's stock price to immediately drop by 40% on concerns that the Company's stock was being severely diluted. The Individual Defendants later canceled most of this offering due to the market's strong negative reaction. Defendant McClendon personally apologized to analysts and investors during a conference call in November 2008 for inadvertently causing the Company's stock price to drop because of dilution concerns.

94.    The lack of operating cash has led the Company to sell off many of its key assets. In 2008, the Company sold off more than $11 billion worth of assets, which represented approximately one-third of the total assets owned by the Company. Some of these sales were completed at prices that were disadvantageous to Chesapeake and reflected the Company's need for immediate infusions of cash. CEO McClendon stated

that one transaction with Statoil occurred at prices that were very favorable to the foreign energy conglomerate.

95.    Chesapeake struggled for cash when the price of natural gas reached unprecedented highs just before the Stock Offering. The Company routinely withdrew all of its $3.5 billion revolving credit facility. The proceeds from the Stock Offering were intended to be used to temporarily pay down the revolving credit facility.

96.    Chesapeake's ongoing cash flow concerns caught the attention of the SEC just prior to the Stock Offering. In the letter dated May 30, 2008, referred to above, the SEC requested additional disclosures regarding the Company's negative cash flow and liquidity problems. The Individual Defendants responded by stating, in effect, that they planned to sell significant assets to raise new working capital and to temporarily resolve their cash problems.

97.    The cash problems that were caused, in part, by aggressively running up lease prices have had a material impact on the Company. Defendant McClendon stated in a conference call in the last quarter of 2008 that concerns over whether the Company had sufficient operating capital caused the Company's stock to trade at a significantly reduced level. Several analysts who track Chesapeake have confirmed his statement. An analyst report published by JP Morgan on November 28, 2008, stated that Chesapeake is the "riskiest of the large–cap group because of the corporate strategy and operating and financial leverage." Others have indicated that Chesapeake trades at reduced multiples because of its liquidity concerns.

98.    In light of these problems, the Individual Defendants should have disclosed in the Prospectus and Registration Statement that the Company's land men were aggressively acquiring land at inflated prices, which was restricting the Company's limited available cash.

## DAMAGES TO THE COMPANY

99.   As the material facts which were not disclosed in the Registration Statement were revealed to the public, the price of Chesapeake stock declined to less than $12 per share, or approximately 80% below the Stock Offering price. This decline was a direct result of the risks defendants failed to disclose in the Stock Offering. The Company's stock has not reached the heights it was at during the Stock Offering since then.



Chesapeake Energy Corp.(CHK) Stock Chart
April 1, 2008 - October 8, 2010



100.   Further, as a result of the defendants' misconduct, Chesapeake's ability to raise capital and borrow funds has been impaired, its common stock has begun trading at reduced multiples of earnings, it has incurred substantial costs defending an ongoing securities fraud class action that survived a motion to dismiss and is now proceeding to expensive discovery, it has experienced increased premiums for its directors and officers liability insurance, and its corporate image and goodwill have been damaged.

## DERIVATIVE ALLEGATIONS

101.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.   Plaintiff brings this action derivatively for the benefit of Chesapeake to redress injuries suffered, and to be suffered, by Chesapeake as a direct result of the breaches of fiduciary duties by the Individual Defendants.   Chesapeake is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

103.   Plaintiff will adequately and fairly represent the interests of Chesapeake in enforcing and prosecuting its rights.

104.   As set forth in paragraph 11, Plaintiff was and is an owner of the stock of Chesapeake.

105.   On March 20, 2009, Plaintiff made a demand ("Demand") on Chesapeake's Board to initiate an investigation regarding the extent of the Company's violations of sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") in connection with the Stock Offering and Registration Statement.  Plaintiff requested that the investigation include a determination of which Chesapeake directors, officers, employees, or agents, if any, were responsible for the violations.  Plaintiff demanded that the Company bring suit against or obtain tolling agreements from any individuals found to be responsible.    Plaintiff also asked the Board to implement sound corporate governance policies to prevent the recurrence of similar conduct.

106.   In the Demand, Plaintiff also requested that if Chesapeake were required to pay any money in connection with a resolution or judgment of related claims asserted by Chesapeake's shareholders, the Company bring legal proceedings against each person responsible for the Company's violations of the Securities Act.  A true and correct copy of Plaintiff's March 20, 2009 Demand is attached hereto as Exhibit 1.

107. On or about March 31, 2009, Jennifer M. Grigsby, Chesapeake Energy's Senior Vice President, Treasurer, and Corporate Secretary, responded to Plaintiff's Demand. In her letter, Ms. Grigsby stated that she was in receipt of the Demand, that it was being communicated to the Board, and that the Board would determine an appropriate course of action. A true and correct copy of Ms. Grigsby's letter is attached hereto as Exhibit 2.

108. From April 2009 through July 2009, neither Ms. Grigsby nor Chesapeake sent any additional correspondence to Plaintiff.

109. Having not received any additional response for nearly four months, Plaintiff sent Chesapeake a letter on July 24, 2009. In this letter, Plaintiff provided the Company with additional information regarding the allegations discussed in the Demand. This supplemental information pertained to the SEC's letter to Chesapeake regarding its failure to provide adequate disclosures about its hedging activities. A true and correct copy of Plaintiff's July 24, 2009 letter is attached hereto as Exhibit 3.

110. On August 11, 2009, Ms. Grigsby sent a response letter to Plaintiff. In this correspondence, she stated that the Board considered the Demand at its meeting on June 11, 2009, and determined the matter should be referred to the Audit Committee for further review and a recommendation to the full Board. The Audit Committee reviewed the letter at its June 11, 2009 meeting, and recommended a course of action that was adopted by the Board. The Audit Committee and the Board decided to defer further action and monitor further developments in a related securities fraud class action.

111. Ms. Grigsby also stated in the August 11, 2009 letter that V. Burns Hargis, the new chairman of the Audit Committee, had been designated to monitor the related securities litigation and report back to the Audit Committee on developments. She also stated that the Board anticipated that an amended complaint would be filed in the related securities case, that a motion to dismiss would then be filed by Chesapeake, and that the briefing on the motion to dismiss would clarify the allegations discussed in the Demand.

The Board expressed its desire to refrain from taking further action with respect to the Demand until the allegations in the related securities case were more developed. The Audit Committee and the Board stated that it was their opinion that *the court was in the best position to evaluate the issues set forth in the Demand*, including the extent to which there may have been a violation of the securities laws.

112.    The August 11, 2009 letter also stated that the Audit Committee and Board believed it was in the best interests of the Company and its shareholders to defer further decisions until the motion to dismiss had been ruled on in the securities case. Finally, the letter stated that the Board was mindful of the statute of limitations on any potential claims the Company may have against its directors, officers, employees, or agents. The Board promised to obtain any necessary tolling agreements prior to the lapse of any claims. A true and correct copy of the August 11, 2009 letter is attached hereto as Exhibit 4.

113.    On November 14, 2009, Ms. Grigsby sent a letter to Plaintiff in which she stated that the additional information included in Plaintiff's July 24, 2009 letter was provided to the Board and the Audit Committee in advance of their regularly scheduled meetings held on September 24, 2009. After reviewing the additional information, the Board and Audit Committee reaffirmed their decision to defer further action on the Demand pending the court's ruling on the Company's motion to dismiss in the related class case. The Board believed the motion to dismiss would determine whether the complaint in that action contained viable allegations that there were securities law violations. A true and correct copy of Ms. Grigsby's November 14, 2009 letter is attached hereto as Exhibit 5.

114.    On December 2, 2009, Plaintiff sent a response letter to Chesapeake's Board. In this correspondence, Plaintiff acknowledged that the Board and the Audit Committee did not plan to take further action until the allegations in the related federal securities fraud class action were more developed and the motion to dismiss had been

ruled on by the court.  Plaintiff also acknowledged that the Board claimed it was mindful of the statute of limitations and would purportedly obtain any necessary tolling agreements.

115.   Plaintiff then expressed concern about the length of time it would take for a final resolution of the motion to dismiss in the related securities case.  Plaintiff explained that the briefing process was proposed to end with the filing of the defendants' reply on January 11, 2010, but that the Board's proposed deferral did not account for the undetermined length of time required to schedule argument for the motion and have a ruling issued.  Plaintiff also pointed out that if appeals were filed, resolution of the motion to dismiss could take months or even years.  Plaintiff stated that the Board's decision to wait for the ultimate determination of the motion to dismiss would likely cause the Demand to not be promptly investigated or resolved.  Plaintiff contended that this lock box approach to a shareholder demand was not in the best interests of Chesapeake.

116.   In the December 2, 2009 letter, Plaintiff cited to the Delaware Supreme Court's decision in *Grimes v. Donald*, in which it ruled that a stockholder is entitled to know *promptly* what action the Board will take regarding a litigation demand.  673 A.2d 1207, 1218 (Del. 1996) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  Plaintiff informed the Board that deferral can constitute "tacit approval" of the shareholder demand and can excuse the demand requirement, citing to *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726 (Del. 1988).  Plaintiff also stated that the case cited by Chesapeake in its August 11th letter, *Furman v. Walton*, No. C06-3532SBA, 2007 WL 1455904 (N.D. Cal. May 16, 2007), supports the line of authority cited by Plaintiff.

117.   Finally, Plaintiff acknowledged that the Board claimed it was mindful of the statute of limitations and would "obtain any necessary tolling agreements prior to the lapse of any claims."  Plaintiff requested clarification regarding which individuals would

be asked to sign tolling agreements and which claims the Company would seek to preserve. A true and correct copy of Plaintiff's December 2, 2009 letter is attached hereto as Exhibit 6.

118.   On January 6, 2010, Plaintiff's counsel and counsel for the Company conferred by telephone.  Counsel for the Company stated that the position articulated in the letters dated August 11, 2009 and November 14, 2009, remained the Company's position as of January 6, 2010. Although counsel for the Company stated that they would review the prior Demand and Company correspondence, they could not state whether, and did not state that, the Company's position would be different upon their review.

119.   On April 15, 2010, Ms. Grigsby sent a letter to Plaintiff. In the letter, she stated, among other things, that the Board and Audit Committee had determined to defer further action as to the Demand "pending additional developments in the Court," which presumably referred to the court in the related securities case. A true and correct copy of Ms. Grigsby's April 15, 2010 letter is attached hereto as Exhibit 7.

120.   On September 15, 2010, Plaintiff's counsel wrote to Ms. Grigsby pointing out that the District Court had determined that litigation could proceed in the related securities case. Therefore, Plaintiff's counsel pointed out that Plaintiff was "entitled to a prompt response from the Board concerning his demand." A true and correct copy of Plaintiff's September 15, 2010 letter is attached hereto as Exhibit 8.

121.   Ms. Grigsby responded on September 15, 2010, stating that Plaintiff's demand and all correspondence concerning the demand was being delivered to the Board and the Audit Committee for consideration at their upcoming September 23, 2010 meetings. A true and correct copy of Ms. Grigsby's September 15, 2010 letter is attached hereto as Exhibit 9.

122.   On October 13, 2010, Ms. Grigsby sent a letter to Plaintiff's counsel stating that the Board and Audit Committee had considered Plaintiff's demand and other correspondence at their meetings on September 23, 2010.  She stated that the Audit

- 34 -

Committee and Board had determined "to defer further action on the demand pending further developments in, or the resolution of, the securities class action." Additionally, Ms. Grigsby stated that the Audit Committee had "considered the statute of limitations" related to Plaintiff's demand and had determined there was "no statute of limitations issue at this time," and therefore, "no current need to enter into agreements that would toll the statute of limitations." A true and correct copy of Ms. Grigsby's October 13, 2010 letter is attached hereto as Exhibit 10.

123. The Board has not definitively responded to Plaintiff's Demand despite the passage of *twenty-nine months* since Plaintiff's Demand was made. Further, the Board has not informed Plaintiff regarding whether any tolling agreements were entered into or which claims it is seeking to preserve. Additionally, the Board has not informed Plaintiff regarding whether it will bring claims against those responsible for the wrongdoing.

124. It appears that the Board has not completed an investigation of the allegations contained in the Demand, has not interviewed potential witnesses, has not gathered or reviewed potentially relevant documents, has not retained outside legal counsel to advise it regarding the Demand, and has not retained outside consultants to investigate the claims made in the Demand.

125. The Board that purportedly considered Plaintiff's Demand consists of the following eight individuals: defendants Davidson, Keating, Maxwell, McClendon, Miller, Nickles, Whittemore and V. Burns Hargis. Additionally, defendant Kerr was on the Board at the time the Demand was made on March 20, 2009. However, Kerr retired from the Board effective June 12, 2009. Defendant Whittemore retired from the Board in June of this year.

126. Plaintiff has not received any definitive assurance from Chesapeake that it has entered into tolling agreements with the Individual Defendants. Consequently, the applicable statute of limitations regarding many of the potential claims against the Individual Defendants may be about to expire and Chesapeake's potential claims based on

these individuals' actions may become time-barred. The apparent failure of the Board to protect the Company's interests by entering into tolling agreements with the Individual Defendants demonstrates that the Board is unwilling to make an earnest effort to seek recovery from the Individual Defendants in connection with their past wrongdoing.

127. The Board's refusal to reach a decision regarding whether it will support or oppose the Demand, and the Board's determination that a court adjudicating claims in a related securities class action was in the best position to evaluate the merits of the claims raised in the Demand, indicate that the Board is not hostile towards or opposed to the Demand. Rather, the Board has demonstrated its neutrality towards the Demand. Black letter law regarding corporations dictates that Board neutrality in the face of a demand waives the demand requirement, permitting the shareholder to proceed with the derivative action.

128. The demand requirement has been waived in the present action. In the alternative, if demand has not been waived, then the Board wrongfully refused the Demand, as explained below.

129. When a Board receives a litigation demand, it must investigate the factual allegations and evaluate the charges raised in the demand to discharge its duty to properly manage corporate affairs. The Board is required to inform itself of all material information reasonably available to them. If the Board fails to engage in these actions, it has wrongfully refused the demand.

130. In the instant matter, the Board did not inform itself of all material information reasonably available. To Plaintiff's knowledge, the Board has not interviewed a single witness or potential defendant regarding the allegations contained in Plaintiff's Demand. The Board has not retained outside counsel or any consultants to investigate the allegations. Further, the Board has not prepared a report containing the results of its findings or its recommended course of action. The Board has taken none of the many actions that are required. Rather, it deferred responsibility to investigate and

evaluate the merits of the claims to a court that is adjudicating claims in a related securities fraud class action. In seeking to abdicate and evade its responsibilities as the managers of the Company, the Board failed to act in good faith, which constitutes wrongful refusal of the Demand.

131. The Board's investigation of the matters discussed in the Demand was neither reasonable nor in good faith, as demonstrated by the following: (i) the Board's abdication of its responsibility to investigate and evaluate the claims in the Demand; (ii) the Board's failure to interview a single witness or potential defendant; (iii) the Board's failure to hire an outside firm to conduct an investigation into the alleged wrongdoing; (iv) the Board's failure to use independent counsel to advise the Board regarding their consideration of the Demand; (v) the Board's failure to produce a report containing its findings or recommended course of action; and (vi) the Board's failure to cause the Company to enter into tolling agreements with the Individual Defendants. Because the Board did not conduct a reasonable investigation or act in good faith, its refusal of the Demand was wrongful.

132. The Board has not filed any lawsuits against those responsible for the misconduct, neither has it attempted to recover for Chesapeake any part of the damages it suffered. Further delay in the filing of a lawsuit alleging claims against the wrongdoers is unnecessary and would be prejudicial to the Company's rights given concerns regarding the statute of limitations, potential fading of witnesses' memories, and the possible destruction of evidence. Accordingly, Plaintiff is filing the instant action to preserve the rights of the Company.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

133. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.   The Individual Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, reasonable inquiry, good faith, and supervision.

135.   Each of the Individual Defendants had a duty to ensure that Chesapeake disseminated accurate, truthful, and complete information to its shareholders and the market. They also had a duty to ensure that Chesapeake's public filings and stock offerings were prepared in accordance with applicable SEC regulations and rules governing their preparation.

136.   The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, and supervision when they caused or allowed the Company to disseminate to the market materially inaccurate and incomplete statements in the Registration Statement, the Prospectus, public filings, and public statements, as detailed herein.

137.   The Individual Defendants also breached their fiduciary duties to properly manage the Company by violating sections 11, 12(a)(2), and 15 of the Securities Act, and causing Chesapeake to violate sections 11 and 12(a)(2) of the Securities Act. Additionally, they violated their fiduciary duties of care, loyalty, and good faith by failing to ensure that Chesapeake's public filings and stock offerings were prepared in accordance with applicable SEC regulations and rules governing their preparation. The Individual Defendants' misconduct did not constitute a good faith exercise of business judgment.

138.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Chesapeake's ability to raise capital and borrow funds has been impaired, its common stock has begun trading at reduced multiples of earnings, it has incurred substantial costs defending a securities fraud class action, it has experienced increased premiums for its directors and officers liability insurance, and its corporate image and goodwill have been damaged.

139.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

140.   Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties;

B.   Directing Chesapeake to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Chesapeake and its shareholders from future damaging events similar to those described herein, including, but not limited to, putting forward resolutions for shareholder vote that would amend the Company's By-Laws or Articles of Incorporation, strengthen the Board's supervision of operations, develop and implement procedures for greater shareholder input into the policies and guidelines of the Board, and strengthen the Company's internal audit and control functions;

C.   Extraordinary equitable and/or injunctive relief as permitted by law and equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting defendants' assets so as to ensure that Plaintiff, on behalf of Chesapeake, has an effective remedy;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E.   Declaring that the Board's neutrality towards the Demand waives the demand requirement, or declaring that the Board wrongfully refused the Demand by failing to conduct a reasonable and good faith investigation of the allegations contained therein; and

F.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

s/ Kenyatta R. Bethea
Kenyatta R. Bethea, OBA# 18650
HOLLOWAY, BETHEA & OSENBAUGH
3035 N.W. 63rd, Suite 102N
Oklahoma City, OK 73116
Telephone: (405) 246-0600
Facsimile:   (405) 246-0601
kbethea@hbolaw.com

-and-

Brian J. Robbins
George C. Aguilar
Jay N. Razzouk
Lauren N. Ochenduszko
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991
**ATTORNEYS FOR PLAINTIFF**
**M. LEE ARNOLD**

**JURY TRIAL DEMANDED**